UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MAINE

WALTER LADD
ADMINISTRATOR of THE ESTATE OF JOANNE LADD
71 Highland Ave.
Turner ME  04282

Plaintiff,

v.

THE TJX COMPANIES, INC. d/b/a TJ MAXX
742 Center St, Auburn, Maine  04210

Defendant.

Comes now Walter Ladd, Executor of the Estate of Joanne Ladd, the plaintiff in the above

matter, acting by and through his attorneys, David A. Weyrens, Hallett Whipple Weyrens, 6 City

Center, Suite 208, Portland, ME 04101  and R. Peter Decato, Decato Law Office, 84 Hanover Street,

Lebanon, New Hampshire 03766 and complains against The TJX Companies, doing business as TJ

Maxx, the defendant in the above matter.  The TJ Maxx store in question is located at 742 Center St,

Auburn, Maine  04210 as follows:

**Preliminary Statement**

1.     This is a wrongful death action brought by Walter Ladd (Walter) who is the father and

administrator of the Estate of Joanne Ladd (Joanne).

2.     On Friday, January 16, 2015, Joanne, who lived in Vermont, was in Maine to visit her father

(Walter) and her step-mother.

3.     Joanne had treated in the past with Dr. Matthew McLaughlin at Central Maine Orthopedics for

chronic back pain and had an appointment with him on January 16.

1

4.    Following the appointment with Dr. McLaughlin, Joanne and her step-mother went to the TJ Maxx store in Auburn, Maine.  The TJ Maxx store in question is located at 742 Center St, Auburn, Maine  04210.

5.    As they walked into the store Joanne unexpectedly, and without notice, stepped in a wet and slippery puddle on the store's tile floor.  She did not see the water and there were no signs in place indicating that the floor might be wet in the area. When she stepped on the wet spot her left leg immediately slipped forward and her right leg went backwards as she fell to the floor.

6.    Joanne felt a pop in her left knee and she felt an immediate sharp pain in the knee as well. Joanne also experienced back pain after her fall.

7.    She reported the incident, and her fall, to a check-out woman and she also showed her where the water was located.  Joanne was told that someone would get to the area with a dry mop immediately.

8.    It was decided that Joanne's step mother would bring the car around to the front of the store so that Joanne didn't have to walk as far on her injured and painful knee.  Joanne left TJ Maxx that day hoping that her pain would resolve with a little bit of rest.  The pain didn't resolve and she underwent treatment for the next 2+ years.

9.    On March 19, 2017, after a long course of treatment, Joanne began to experience an altered mental status, confusion and agitation.  Frantic, she tried to call family and friends but ultimately dialed 911.  When first responders arrived at her residence Joanne was found on the floor, confused and not responding to questions appropriately.  She was brought urgently to the Dartmouth Hitchcock Medical Center in Hanover, New Hampshire.

10.    Upon arrival, Joanne was still very agitated and unable to respond to questions with appropriate answers.  Joanne was concerned that she was suffering a stroke and in response

to her dire medical condition imaging studies were performed.

11.   Chest CT scans showed multiple thrombotic events in both the arterial and venous vasculature confirming the fears of her treating providers.  Dr. Andrew Craig ultimately determined that more likely than not Joanne had suffered from a deep venous thrombosis in her left leg as a result of a prior surgery relating to her knee injury and that ultimately embolized to her right heart and pulmonary arteries.

12.   Joanne was admitted to ICU where she remained for nearly a week.  On her way back from a CT scan on March 19, 2017 Joanne suffered a seizure and then became unresponsive.

13.   Rapid Sequence Intubation was performed because she was no longer protecting her airway. Tragically, Joanne never regained consciousness.   Over the next few days Joanne's neurological condition deteriorated and ultimately she passed away on March 25, 2017.  Her passing was caused by and is directly linked to her injuries on January 16, 2015.

**Jurisdiction**

14.   This court has jurisdiction as there is diversity of citizenship and the amount in controversy exceeds $75,000.  _See_ 28 U.S.C. section 1332.)

15.   This Court has the authority to consider the remaining causes of action under its supplemental jurisdiction to determine issues of state law which arise out of the same occurrence.  See 28 U.S.C. Section 1367.

16.   There exists between the parties an actual controversy justiciable in nature.

17.   The Plaintiff, Walter Ladd is a citizen of the United States and a resident of the State of Maine. Walter resides at 71 Highland Ave., Turner ME  04282.

18.   At all times pertinent to this Complaint, the Defendant, did business in the State of Maine.

More specifically, The TJX Companies was doing business as TJ Maxx, at a store located at 742 Center St, Auburn, Maine  04210.

### Factual Allegations

19.  On Friday, January 16, 2015, Joanne, who lives in Vermont, was in Maine to visit her father and step-mother.

20.  Joanne treated with Dr. Matthew McLaughlin at Central Maine Orthopedics for chronic back pain prior and had an appointment with him on January 16th.

21.  Following the appointment Joanne and her step-mother went to the TJ Maxx store in Auburn, Maine. As they walked into the store Joanne unexpectedly, and without notice, stepped in a wet and slippery puddle on the store's tile floor. She did not see the water and there were no signs in place indicating that the floor might be wet in the area. When she stepped on the wet spot her left leg immediately slipped forward and her right leg went backwards as she fell to the floor. She felt a pop in her left knee and had immediate sharp pain in the knee. Joanne also experienced back pain after her fall.

22.  She reported the incident, and her fall, to a check-out woman and she also showed her where the water was located. Joanne was told that someone would get to the area with a dry mop immediately. It was decided that Joanne's step mother would bring the car around to the front of the store so that Joanne didn't have to walk as far on her injured and painful knee. Joanne left TJ Maxx that day hoping that her pain would resolve with a little bit of rest.

23.  That evening, Joanne soaked herself in a warm bath in an attempt to relieve her pain and also took over the counter medications. The next morning, Joanne called the store back and requested to speak with a manager about the incident. She was told that a manager would call her back by the end of the day. After not receiving a call Joanne called the store at least two

more times requesting a manager. Finally, on Tuesday January 20th, 2015, a representative from Zurich Insurance called Joanne back.

24. Joanne arranged to see her primary care physician, back in Vermont, on January 20, 2015. The Monday following the fall Joanne was seen at White River Family Practice by Lynne Chow, FNP. Joanne reported that her left knee pain was causing numbness in her foot and difficulty walking. Lynne Chow examined her and found instability and limited range of motion in the knee and decided a referral to an orthopedic specialist was in order. That same day Joanne called her orthopedic provider in Maine and informed them of the increased back pain from the fall, the onset of new pain in her left knee and explained that she was walking with a limp.

25. In the month following the accident Joanne continued to have swelling and constant severe, aching pain in her left knee. She was referred by Lynne Chow to a local orthopedic physician, Dr. John Houde at APD Orthopaedic Clinic on February 12, 2015. On examination Joanne's knee was found to be very tender at the posterior lateral and anterior joint line with moderate swelling. Dr. Houde noted a distinct click in the knee with flexion and extension which also elicited significant pain. She was also found to be walking with a distinct limp. Dr. Houde opined that Joanne might be suffering from a medial and lateral meniscal tear and ordered MRI studies to explore the same. He also administered a cortisone injection into the knee.

26. Joanne's knee continued to get worse and she called Dr. Houde's office on February 23, 2015 to report the same. The MRI study was completed at the APD Orthopaedic Clinic on February 24, 2015 and showed attenuation of her medial meniscus, joint effusion, probable subchondral cyst and adjacent edema of the posterior patella laterally and signal abnormality at the medial femoral condyle.

27.    Joanne met with Dr. Houde on March 2, 2015 to review the results of the MRI. Dr. Houde
       explained that MRI was consistent with a tear of the lateral cartilage or meniscus of the knee
       and a peripheral posteriolateral tear. Dr. Houde recommended a physical therapy consult and
       also provided Joanne with a prescription for Lidoderm topical patches. They discussed surgical
       intervention with a plan to complete the same after Joanne's planned trip to Spain.

28.    As recommended by Dr. Houde, Joanne was evaluated at Plainfield Physical Therapy on March
       12, 2015 for pre-op strengthening of the knee. Joanne, an assistant principal, planned to go to
       Spain in 3 weeks with her students and was very concerned about walking during the trip. She
       was experiencing pain with ambulation, difficulty climbing and descending stairs and standing
       for prolonged periods of time. Her knee was swollen, and she had to elevate her leg regularly.
       She was also experiencing decreased range of motion and strength. As planned, Joanne was
       seen four times for pre-op strengthening at Plainfield Physical Therapy on March 12, April 7,
       and April 21, 2015.

29.    Following a pre-operative appointment on April 23, 2015 Houde performed a left knee
       arthroscopy and partial medial and lateral meniscectomy surgery at the APD Memorial Hospital
       on April 29, 2015. At surgery, Dr. Houde found tears in the posterior, posteromedial and the
       medial horn of the medial meniscus; a lateral tear into the posterolateral & anterolateral horn
       of the lateral meniscus; and chondromalacia patellae.

30.    Joanne was seen by Dr. Houde the day after surgery. She was ambulating using crutches and
       reported that she was icing her knee with the cryocuff as instructed. She was taking pain
       medications and also post-operative antibiotics.

31.    When she returned for her second follow-up with Dr. Houde on May I l, 2015, she was full
       weightbearing without any assistive device. She was, however, experiencing an increase in

6

swelling and pain with her attempted return to regular activity. At the time of this appointment she had re-started treatment with Plainfield Physical Therapy and was performing home strengthening exercises.

32.   On examination Dr. Houde noted moderate diffuse swelling and pain with extension/flexion. He also found joint line tenderness and noted Joanne was still walking with a limp. Dr. Houde decided to write a prescription for Dilaudid and also recommended Ibuprofen for pain management. Joanne was instructed to continue her home exercise program and they discussed a planned return to part-time, desk only work on May 26, 2015. The plan was that after returning to work she would remain on light duty for 6-8 weeks.

33.   Over the next few months Joanne continued to receive physical therapy at Plainfield Physical therapy. She also was seen at Dr. Houde's office on a monthly basis. Despite her compliance with her treatment plan Joanne' persistent left knee pain did not resolve. On June 15, 2015, Joanne was back to work part-time but still had to limit her activities. On July 21, 2015 Plainfield Physical Therapy called Dr. Houde's office to notify them that Joanne was experiencing an increase in pain and was found to have a I " effusion of the knee.

34.   When Joanne returned to Dr. Houde on August 27, 2015 with continued knee pain, he performed a cortisone injection procedure in an effort to provide some pain relief and she was given a neo-tracker brace and told to ice the knee frequently.

35.   Following the cortisone injection Joanne found some relief and a series of Synvisc injections were planned. Joanne received those injections on November 6, November 13, and November 23, 2015.

36.   Despite the injections, on December 8, 2015 Joanne reported to Dr. Houde that the pain continued to worsen and she was having a hard time walking. The injections had helped the

pain in front of her knee but she still had severe pain in back of the knee. It was particularly bad when going down stairs or walking downhill. X-rays an MRI study were ordered to further evaluate the knee. Dr. Houde also prescribed Lidoderm patches for pain. Joanne was also referred back to physical therapy at this time.

37.    The MRI was completed on December 14, 2015 and showed joint effusion was slightly increased from February 24, 2015 with a large component I lateral recess of the iliotibial band, abnormality in the menisci consistent with her prior surgery and new bone contusions.

38.    When she was next seen on January 5, 2016, Dr. Houde felt that a more regimented course of NSAIDS might help and he prescribed Keterolac, a Medrol dose pak and Naprosyn. Those medications did not relieve her left knee pain or the swelling.  As such, Joanne had another cortisone injection on February 11, 2016.

39.    In February of 2016 Joanne also sought out a second opinion because of her continued frustration related to her ongoing knee pain. Joanne saw Dr. Jeffrey Bush art Central Maine Orthopedics on February 4, 2016. Dr. Bush generally confirmed that the course of treatment she was receiving from Dr. Houde was appropriate and recommended that she continue her treatment with him.

40.    The relief from the injection was again short-lived. On March 31 st Dr. Houde prescribed a longer taper of oral prednisone and Lidoderm patches. She was again referred to physical therapy.

41.    Joanne continued to experience pain flare ups in her knee through the spring and early summer of 2016 a series of Orthovisc injections were planned and those injections were administered by Dr. Houde on June 6, June 13 and June 20, 2016. Physical therapy continued through to June 28, 2016.

8

42.  At an appointment with Dr. Houde on August 2, 2016 Joanne reported that the injections decreased her anterior knee pain somewhat, but the pain was worse with any increased activity. She reported experiencing an onset of right knee pain due to over compensation for her left knee.

43.  Nearing two years since her fall at TJ Maxx, at this point Joanne was extremely frustrated with the continued and worsening pain in her left knee. When she was seen by Dr. Houde on December 6, 2016, a new MRI was ordered. The MRI showed evidence that as a result of her prior meniscal injury and meniscectomy Joanne had developed subchondral cystic changes and bony edema within the lateral facet of the patella and medial aspect of lateral tibial plateau. Dr. Houde reviewed the MRI on December 22, 2016 with Joanne and they discussed her options. It was felt that her pain was significant enough to again proceed with surgical intervention.

44.  On February 3, 2017, Joanne was brought back to surgery. Dr. Houde performed a left knee subchondral microfracture repair and left knee arthroscopy with gentle debridement of unstable articular cartilage in the medial aspect and lateral tibial plateau. Joanne was expected to remain out of work for approximately 6 to 8 weeks after the procedure.

45.  Joanne had her first in person follow-up appointment with Dr. Houde on February 13, 2017. She reported moderate generalized knee pain and that she was having a difficult time treating with her medications. She was partial weightbearing with the use of crutches and a postop knee brace that was set to be locked in extension position.

46.  When Joanne was seen by Dr. Houde on March 8, 2017, Joanne still had pain but felt she was making slow but daily gains. She was partial weightbearing, estimated at 75% on her left, with the use of crutches and the knee brace but she was finding the brace difficult to wear. She reported that she was doing well with pain management and was only taking Tylenol

periodically if needed. X-rays were taken which showed postsurgical mild spurring at the patellofemoral joint. She was to follow-up in 4 to 6 weeks and remained out of work until March 16 at which time she would return on light duty for 6 to 8 weeks. She was told to continue using crutches and knee brace, use handicap parking, avoid stairs and ice her knee.

47.  Unfortunately, this is where Joanne's recovery from her accident related knee surgery took a tragic turn. On March 19, 2017, Joanne began to experience an altered mental status, confusion and agitation. Frantic, she tried to call family and friends but ultimately dialed 911. When first responders arrived at her residence Joanne was found on the floor, confused and not responding to questions appropriately. She was brought urgently to the Dartmouth Hitchcock Medical Center. Upon arrival Joanne was still very agitated and unable to respond to questions with appropriate answers. Concerned that she was suffering a stroke and in response to her dire medical condition imaging studies were performed. Chest CT scans showed multiple thrombotic events in both the arterial and venous vasculature confirming the fears of her treating providers. Dr. Andrew Craig ultimately determined that more likely than not Joanne had suffered from a deep venous thrombosis in her left leg as a result of the surgery and that ultimately embolized to her right heart and pulmonary arteries. She was admitted to ICU where she remained for nearly a week.

48.  On her way back from a CT scan on March 19, 2017 Joanne suffered a seizure and then became unresponsive. Rapid Sequence Intubation was performed because she was no longer protecting her airway. Tragically, Joanne never regained consciousness. Over the next few days Joanne's neurological condition deteriorated and ultimately she passed away on March 25, 2017.

## CAUSE OF ACTION #1 - NEGLIGENCE

49.  The factual allegations described in the first 48 paragraphs are repeated and incorporated herein by reference.

50.  The defendant owed Joanne a duty of care to take reasonable steps in keeping their premises in a reasonably safe condition. The presence of water on the floor was an unreasonably unsafe condition that caused Joanne to fall and set in motion a course of treatment from the knee injury she suffered that ultimately led to her death in February of 2017.

51.  Joanne's fall occurred as she was entering the TJ Maxx store. It is reasonably foreseeable that people will track snow and water into the store in January, in Maine. (See Currier v. Toys R Us, Inc. 680 A.2d 453 (Me. 1996). Despite this obvious danger the defendant did not take reasonable steps to mitigate the risk of someone falling from such a situation. Instead, a dangerous condition was left untreated and Joanne's injuries were a direct result of that negligence.

52.  Joanne's death ultimately flows from the original accident at TJ Maxx. If Joanne had not hurt her knee on January 16, 2015 she would not have been in surgery on February 3, 2017. Her untimely death was ultimately caused by a complication that developed during her recovery from the February 3, 2017 surgery.  Maine courts have defined proximate cause as "that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred. Wing v. Morse, 300 A.2d 491, 495 (Me. 1973).

53.  Damages caused by a medical complication developed during treatment from an initial injury is a reasonable consequence of the original harm for which a tortfeasor is liable. (See Sleeves v. Irwin, 233 A.2d 126 (Me. 1967).

11

54.   At the time of her fall, Joanne was employed by the Mascoma Valley Regional School District as the Assistant Principal. From January 16, 2015 through July 27 2016, Joanne lost a total of 33.9375 days of work.

55.   After her surgery on February 3, 2017 Joanne was kept out of work until March 16, 2017. Dr. Houde provided her with an out of work note at her appointment on March 8, 2017 with an anticipated return date of March 16, 2017 which was another 30 days of lost wages. As such, Joanne and her estate have a lost wage claim exceeding $22,000.00.

56.   Joanne's related medical bills total $228,093.60.

57.   Joanne's Estate requests an award of damages as will provide fair and just compensation with reference to Joanne's pecuniary injuries resulting from death (see Count II), an award of damages that will compensate Joanne's Estate for reasonable expenses of medical, surgical and hospital care and treatment and for reasonable funeral expenses, an award of damages that will compensate Walter Ladd, Joanne's next-of-kin and closest relative for the loss of comfort, society and companionship of the deceased, including any damages for emotional distress arising from the same facts as those constituting the underlying claim.  See, Me. Rev. Stat. tit. 18-A, § 2-804.

## COUNT II - WRONGFUL DEATH

58.   The factual allegations described in the first 57 paragraphs are repeated and incorporated herein by reference.

59.   The defendant's negligence lead to and became the proximate cause of Joanne's death.

60.   Due to the loss of Joanne's life, Joanne's Estate requests an award of damages as will provide fair and just compensation with reference to Joanne's pecuniary injuries resulting from death, an award of damages that will compensate Joanne's Estate for reasonable expenses of medical,

surgical and hospital care and treatment and for reasonable funeral expenses, an award of damages that will compensate Walter Ladd, Joanne's next-of-kin and closest relative for the loss of comfort, society and companionship of the deceased, including any damages for emotional distress arising from the same facts as those constituting the underlying claim.  See, Me. Rev. Stat. tit. 18-A, § 2-804.

WHEREFORE, the plaintiff respectfully prays as follows:

A.    For an award of damages in a sum within the minimum and maximum jurisdictional limits of the Honorable Court to include damages awardable under Me. Rev. Stat. tit. 18-A, § 2-804; and

B.    For such further relief as may be fair and just.

Dated this 22nd day of March, 2019.

> Walter Ladd, Admin. of the Estate of Joann Ladd
> By his attorney
> Decato Law Office
>
> By:    /s/ David A. Weyrens (Me. Bar No          )
> Hallett Whipple Weyrens
> 6 City Center, Suite 208
> Portland, ME 04101
> Phone: 207-464-8047
> Fax: 207-775-4229
> dweyrens@hww.law
>
> By:    /s/ R. Peter Decato (N.H. Bar 613)
> appearing pro hac vice
> Decato Law Office
> 84 Hanover Street
> Lebanon, New Hampshire  03766
> Tel.  603-640-2020
> Email address:  pdecato@decatolaw.com